**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| THE STATE OF IOWA, in its sovereign capacity;<br><br>THE STATE OF MISSOURI, in its sovereign capacity;<br><br>THE AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE,<br><br>        *Plaintiffs*,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as the Attorney General of New York;<br><br>AMANDA LEFTON, in her official capacity as Commissioner of the New York State Department of Environmental Conservation,<br><br>        *Defendants*. | Civil Case No.: |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

1

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................2

INTRODUCTION ....................................................................................................3

PARTIES.................................................................................................................7

JURISDICTION AND VENUE.................................................................................8

FACTUAL ALLEGATIONS ......................................................................................8

   A.  Our Constitution's Federal Structure Has Both
       Vertical and Horizontal Limits............................................................8

   B.  Global Climate Change Is a Quintessentially National Concern.....................11

   C.  New York Attempts to Regulate Global Greenhouse Gas Emissions..............13

      1.   The GHG Rule Regulates Biofuel Producers and Suppliers.......................16

      2.   The Plain Text of the GHG Rule Applies
           New York's Jurisdiction Extraterritorially....................................20

      3.   The Consequences for Being a Reporting Entity
           Are Substantial, to Include Criminal Penalties .........................................25

   D.  State Plaintiffs Have Different Greenhouse Gas Policies ...............................31

   E.  The GHG Rule Harms Plaintiffs .........................................................33

      1.   State Plaintiffs' Harm .........................................................33

      2.   AmFree's Harm ....................................................................37

COUNT I
Violation of the Constitution's
Prohibition on Extraterritorial Regulation ..............................................38

COUNT II
Federal Preemption
(U.S. Const. art. VI, cl. 2) ........................................................................46

COUNT III
Violation of the Constitution's Due Process Clause
(U.S. Const. amend. XIV) ........................................................................47

COUNT IV
Violation of the Constitution's Prohibition on
Unreasonable Searches (U.S. Const. amend. IV) ......................................48

PRAYER FOR RELIEF ..........................................................................51

**INTRODUCTION**

1.    New York treats global climate change like a local issue, and its latest attempt to regulate greenhouse gas emissions, including activity and emissions occurring outside of New York, violates core constitutional principles. Plaintiffs, the States of Iowa and Missouri (together, "State Plaintiffs") and the American Free Enterprise Chamber of Commerce ("AmFree"), ask this Court to "referee [this] dispute[] about where one State's authority ends and another's begins." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023).

2.    In 2019, New York enacted a law requiring considerable reductions in the State's greenhouse gas emissions by 2030 and even more considerable reductions by 2040. The law did not specify how those reductions would be achieved. Rather, it directed New York's environmental agency to issue regulations supplying those details. Those emissions reduction regulations have not yet been issued.

3.    In the meantime, on December 1, 2025, New York issued regulations establishing a Mandatory Greenhouse Gas Reporting Program (the "GHG Rule"), https://bit.ly/4b2SJe2.

4.    The GHG Rule does not set emissions limits. It imposes reporting and compliance obligations to generate information that New York intends to use, in the future, to create regulations for reducing New York's greenhouse gas emissions considerably by 2030.

5.    New York estimates that the GHG Rule's compliance costs for each reporting entity could range from approximately $17,500 to more than $91,000 with a midpoint of just under $57,000 per facility, per year. The GHG Rule also states that

New York may enter and inspect a reporting entity's property without notice, impose civil and criminal penalties, and enjoin any violations.

6.     But the GHG Rule does not apply only to entities located in or doing business in New York. Instead, it reaches activity beyond New York's borders. In our federal system, New York, like every State, retains the sovereignty not provided to the national government. With that sovereignty, New York may, consistent with the Constitution and federal law, regulate individuals and firms located or conducting business within New York's borders. Those regulations could include, if New York's elected representatives so choose, imposing onerous burdens on the State's economic activity through greenhouse gas reporting requirements and emissions limits. But any otherwise lawful regulations New York chooses to implement must be limited to New York's own jurisdiction.

7.     Although the GHG Rule does, in certain places, expressly limit reporting to New York conduct, the rule imposes reporting requirements, compliance costs, and potential criminal and civil penalties for activity occurring outside of New York. In particular, the lengthy, complex rule requires Fuel Suppliers—defined to include ethanol and biodiesel producers and distributors—to register with and report to New York the amount of Liquid Fuel that *may* be sold in New York, irrespective of where the initial sale or production occurs. Not only is the GHG Rule requirement nearly impossible for a distant-from-New-York producer or distributor to satisfy, the rule is also unconstitutional.

4

8. Indeed, regulatory comments raised concerns with the GHG Rule's extraterritorial application, and New York responded—not by disavowing that the rule applies extraterritorially—but by flatly asserting that the GHG Rule is consistent with the Constitution and necessary to comply with New York's law requiring significant greenhouse gas emissions reductions by 2030.

9. As currently written, the GHG Rule reaches all the way to Fuel Suppliers in Iowa and Missouri, together with AmFree's members in the biofuels industry.

10. Iowa produces the most ethanol and biodiesel of any State in the nation. In 2025, Iowa has 42 ethanol refineries that produced approximately 4.6 billion gallons, which was approximately 28% of the nation's production. Iowa also has eight biodiesel refineries that, in 2024, produced approximately 353 million gallons, which was approximately 17% of the nation's production. Together, the industries are responsible for more than $5.6 billion of Iowa's GDP, generate more than $2.3 billion in income for Iowans, and sustain more than 31,000 jobs throughout Iowa's economy.

11. Missouri is the thirteenth largest ethanol producing State. It has six ethanol refineries that produced 338 million gallons of ethanol in 2023. It is also the second largest state source of biodiesel, with five biodiesel plants that produced approximately 257 million gallons in 2023.

12. AmFree has members who produce and distribute ethanol in various States in the Midwestern United States. These entities and their operations are

geographically far removed from New York and beyond New York's jurisdiction, yet the GHG Rule purports to regulate them directly.

13.     AmFree also has members located outside of New York who purchase ethanol and biodiesel outside of New York. Those purchasers will face higher prices because of the increased regulatory burden New York seeks to impose on out-of-state producers and distributors of ethanol and biodiesel.

14.     Moreover, State Plaintiffs have their own policies, interests, and sovereignty. They have chosen not to require the equivalent of the GHG Rule's "Fuel Suppliers" to register with the State and provide yearly reports on Fuel sold. But New York's rule impairs State Plaintiffs' ability to regulate within their own jurisdiction, as sovereigns equal to New York under our Constitution.

15.     The GHG Rule suffers from additional constitutional defects. The rule is preempted by the Federal Clean Air Act because it applies New York law to out-of-state conduct. The GHG Rule also violates the Due Process of State Plaintiffs' citizens and AmFree's members whom New York purports to subject to New York's jurisdiction without the constitutionally required "minimum contacts." And the GHG Rule violates the Fourth Amendment's guarantee against unreasonable searches by declaring that New York regulators are authorized to search the property of State Plaintiffs' citizens and AmFree's members without notice and an opportunity to object.

16.     Plaintiffs respectfully request that the Court enjoin the enforcement of the GHG Rule or, at a minimum, enjoin New York from applying the rule (i) in Iowa

6

and Missouri, (ii) to entities registered in either State for activity occurring outside of New York, and (iii) to AmFree's members for activity occurring outside of New York.

## PARTIES

17. Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Iowa brings this suit through its attorney general, Brenna Bird. She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.

18. Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Missouri brings this suit through its attorney general, Catherine Hanaway. She is authorized by Missouri law to sue on the State's behalf under Mo. Rev. Stat. § 27.060.

19. Plaintiff American Free Enterprise Chamber of Commerce ("AmFree") is a 501(c)(6) membership organization founded in 2022 that represents entrepreneurs and businesses across many economic sectors. AmFree's members are vitally interested in preserving free markets and free innovation, while resisting government overreach. AmFree's members include ethanol producers and distributors, together with purchasers of biofuels.

20. Defendant Letitia James is the Attorney General of New York. Defendant James is responsible for administering and enforcing New York's GHG Rule. Defendant James is sued in her official capacity.

21.    Defendant Amanda Lefton is the Commissioner of the New York State Department of Environmental Conservation ("DEC") and is sued in her official capacity as the head of the agency. As head of DEC, she is tasked with enforcing the regulation challenged here, *Mandatory Greenhouse Gas (GHG) Reporting Program*, N.Y. Comp. Codes R. & Regs. tit. 6, part 253.

22.    Throughout this Complaint, Defendants are referred to jointly as DEC or New York, unless otherwise specified.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

24.    This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 1651, 2201, and 2202.

25.    The Court has the authority to award relief against Defendants under 42 U.S.C. § 1983 and *Ex Parte Young*, 209 U.S. 123 (1908).

26.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject to the action is situated, in this judicial district.

## FACTUAL ALLEGATIONS

A.    **Our Constitution's Federal Structure Has Both Vertical and Horizontal Limits**

27.    Our Constitution's federal structure embodies familiar structural principles that are worth repeating and necessary to defend.

8

28.   "As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). With this vertical division of power, the "Framers split the Atom of sovereignty," *U.S. Term Limits Inc., v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring), by creating a "compound republic" with power "divided between two distinct governments," The Federalist No. 51, at 270 (James Madison) (George W. Carey & James McClellan eds., 2001).

29.   Although the national government's laws are supreme over State law, U.S. Const. art. VI, cl. 2, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000)—which "are few and defined," whereas "[t]hose which are to remain in the State governments are numerous and indefinite," *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting The Federalist No. 45 (James Madison)).

30.   Therefore, "the National Government possesses only limited powers; the States and the people retain the remainder," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533 (2012)—"a residuary and inviolable sovereignty over all other objects" not addressed by the national government, The Federalist No. 39, at 198 (James Madison).

31.   As the Supreme Court has repeatedly recognized, the division of authority tends to resist "the accumulation of excessive power," *Lopez*, 514 U.S. at 552, and so "[t]his constitutionally mandated division of authority 'was adopted by the Framers to ensure protection of our fundamental liberties,'" *id.* (quoting *Gregory*

9

*v. Ashcroft,* 501 U.S. 452, 458 (1991)). *See Printz v. United States*, 521 U.S. 898, 921 (1997) ("This separation of the two spheres is one of the Constitution's structural protections of liberty."). Some attributes of sovereignty are so elemental to our republican form of government that they are inherent in the compact that formed this nation. *See Printz*, 521 U.S. 898; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71–72 (1996).

32.     Although "[t]he States thus retain substantial sovereign authority under our constitutional system," *Gregory*, 501 U.S. at 457, the Constitution also places horizontal limits on how far state sovereignty extends in relation to other States.

33.     The Supreme Court has long held that "[n]o State can legislate except with reference to its own jurisdiction." *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881). This is because "[l]aws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extraterritorial effect only by the comity of other States." *Huntington v. Attrill*, 146 U.S. 657, 669 (1892); *see United States v. Rodgers*, 150 U.S. 249, 282 (1893) (holding that state authority is "coextensive with its territory").

34.     As a result, "State sovereign authority is bounded by the States' respective borders," *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025), and no State may "impose its own policy choice on neighboring States," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 570–71 (1996).

10

35. That territorial limit of State authority "is so obviously the necessary result of the Constitution that it has rarely been called in question." *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

36. The Constitution "takes great care to provide rules for fixing and changing state borders" and, through its structure, makes an "effort to mediate competing claims of sovereign authority under our horizontal separation of powers." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375, 376 (2023). And because the Constitution empowers federal courts to "referee disputes about where one State's authority ends and another's begins," *id.* at 375, the Supreme Court has invalidated State actions that exceeded "the usual 'legislative power of a State to act upon persons and property within the limits of its own territory,'" *see id.* (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).

37. The Supreme Court has described this extraterritoriality principle as the "territorial limits of state authority under the Constitution's horizontal separation of powers." *Pork Producers*, 598 U.S. at 376 n.1.

**B. Global Climate Change Is a Quintessentially National Concern**

38. In recent years, courts have faced local efforts, including those under New York law, to address the "effects of emissions made around the globe over the past several hundred years." *See City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021). Indeed, lawmakers in New York have repeatedly tried to address the worldwide problem of global climate change by trying to apply local law to "the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet." *See id.*

11

39. But the regulation of carbon dioxide and other greenhouse gases is an "area[] of special federal interest," *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) ("AEP"), governed by federal common law, *id.* at 421. *See also Illinois v. City of Milwaukee, Wis.*, 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law.").

40. That federal common law is partially displaced by statute. Because the Supreme Court has held that the Clean Air Act authorizes the Environmental Protection Agency to regulate greenhouse gas emissions, *Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007), the "Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions" that are "subject to regulation under the [Clean Air] Act." *AEP*, 564 U.S. at 424.

41. Separately, but relatedly, interstate disputes over air and water resources are subject to federal law. *Illinois*, 406 at 105 & n.6. To hold otherwise, "would lead to chaotic confrontation between sovereign states." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496 (1987). Federal law "carefully defines the role of both the source and affected States, and specifically provides for a process whereby their interests will be considered and balanced by the source State and the EPA." *Id.* at 497.

42. There is a limited, inapplicable exception. The Clean Air Act permits states to enforce standards that are more stringent than federal standards. 42 U.S.C. § 7416. States can therefore apply their own more-stringent law to regulate emissions that come from within their own borders. *City of New York*, 993 F.3d at 99–100

12

(quoting *Ouellette*, 479 U.S. at 497). But where a State wishes to regulate pollution affecting the State—but originating from outside its borders—the State must apply the law of the State where the discharge occurred. *Ouellette*, 479 U.S. at 497.

**C.   New York Attempts to Regulate Global Greenhouse Gas Emissions**

43.    In 2019, the New York Legislature passed the *Climate Leadership and Community Protection Act* ("Climate Act"), which became effective on January 1, 2020. CLCPA § 1(1), 2019 N.Y. Sess. Laws Ch. 106 (S. 6599).

44.    The law states that "industrialized countries must reduce their greenhouse gas emissions" and refers to international agreements such as the December 2015 United Nations Framework Convention on Climate Change and the 2016 Paris Agreement. *Id.* § 2. The Climate Act optimistically hopes that "[a]ction undertaken by New York to reduce greenhouse gas emissions will have an impact on global greenhouse gas emissions and the rate of climate change." *Id.* § 3.

45.    The Climate Act's core requirement declares that, by 2030, state-wide emissions of carbon dioxide equivalents[1] (or $CO_{2e}$) will be 60% of 1990 emissions and that, by 2050, emissions will be 15% of those in 1990. N.Y. Env't Conserv. Law § 75-0107.

---

[1] The Climate Law defines "carbon dioxide equivalent" to mean the amount of carbon dioxide by mass that would produce the same global warming impact as a given mass of another greenhouse gas over an integrated twenty-year time frame after emission. N.Y. Env't Conserv. Law § 75-0101(2). To calculate $CO_2e$, New York has adopted certain values that are multiplied by the volume of the greenhouse gas at issue. *See* N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.3(b)(58) (incorporating *id.* § 496.5). For example, methane has a $CO_2e$ value that is 84 times larger than carbon dioxide. *Id.* § 496.5.

46. Although the Climate Act sets these general targets, the law does not establish any specific emissions limits.

47. The law instead contemplates that DEC will create rules implementing the Climate Act. *See id.* § 75-0109.

48. The deadline for issuing those rules passed on January 1, 2024, and although New York has announced a "cap-and-invest program" that may, eventually, be used to limit greenhouse gas emissions, *see* Clean Air Initiative, https://capandinvest.ny.gov/, (last visited May 12, 2026), DEC has not issued any rules imposing limits on greenhouse gas emissions.

49. Meanwhile, DEC created New York's Mandatory Greenhouse Gas Reporting Program, N.Y. Comp. Codes R. & Regs. tit. 6, part 253, https://bit.ly/4b2SJe2—a lengthy regulation purporting to dictate who must report which greenhouse gas emissions, together with when and how to report.

50. The stated purpose of the December 1, 2025 GHG Rule is to "collect the information necessary . . . and develop effective strategies that reduce harmful air pollution and direct investments where they are most needed." Press Release, DEC, DEC Finalizes Program to Track Climate Pollution Sources (Dec. 1, 2025), https://on.ny.gov/49oeoMm.

51. The GHG Rule's purpose is therefore to help DEC draft the long-overdue substantive rules that will try to curb greenhouse gas emissions sufficiently to meet the Climate Act's targets, by collecting information on greenhouse gas emissions.

14

52.     Per the GHG Rule, "Reporting Entities" in certain "Reporting Categories" must file yearly emissions reports with DEC. N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(b).

53.     The first emissions reports are due on June 1, 2027, for 2026 emissions data. *Id.* § 253-1.4(b). This means that Reporting Entities needed to start collecting relevant data on January 1, 2026.

54.     Though the final rule expressly narrowed its jurisdictional reach with respect to certain industries and activities, including producers of agricultural liming material, it is not so modest with respect to Fuel Suppliers.

55.     The GHG Rule, on its face, purports to regulate conduct and transactions related to "Liquid Fuels" and their supply chain that occur well outside of New York's jurisdiction and as far away as Iowa and Missouri.

56.     And once DEC asserts agency jurisdiction over a Reporting Entity, that entity must continue to report for all future years until the requirements for cessation in the GHG Rule are met. *Id.* § 253-1.2(c).

57.     DEC may also assume jurisdiction over certain types of entities and request that an entity provide a "demonstration of non-applicability" of the GHG Rule within 30 days of New York's written request. *Id.* § 253-1.2(m).

58.     Read as a whole, the GHG Rule asserts a staggeringly broad scope, threatening to encompass activities unconnected to New York.

59.     And entities apparently required to register face severe consequences should they fail to comply. DEC asserts substantial civil and criminal enforcement

power over these Reporting Entities unless and until DEC permits them to cease reporting. N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.9(a); N.Y. Env't Conserv. Law § 71-1307.

**1. The GHG Rule Regulates Biofuel Producers and Suppliers**

60.    The GHG Rule covers six "Reporting Categories": "facilit[ies] within New York," "Fuel suppliers," "Waste Haulers and Transporters," "Electric Power Entities," "Suppliers of Agricultural Lime and Fertilizer," and "Anaerobic Digestion and Liquid Storage of Waste." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(b).

61.    Through a chain of definitions, "Fuel Suppliers" includes ethanol and biodiesel producers and distributors: "Fuel Suppliers" includes "Suppliers of Liquid Fuels and Petroleum Products," *id.* § 253-1.2(b)(2)(ii); "Liquid Fuel" includes "Biomass-derived fuels or products," *id.* § 253-1.3(b)(248), which, in turn, includes ethanol and biodiesel, *id.* § 253-1.3(b)(37).

62.    "Supplier" is defined to include "[a] producer." *Id.* § 253-1.3(b)(405).

63.    And "Fuel" is defined to be "[a] solid, liquid, or gaseous combustible material," which includes ethanol and biodiesel, both of which are liquid combustible material. *Id.* § 253-1.3(b)(173).

64.    The threshold for reporting is, in essence, all production and distribution because the reporting threshold for Suppliers of Liquid Fuels is "the gallons of affected liquid fuel necessary to generate any GHG emissions per emission year." *Id.* § 253-1.2(c)(3)(ii)(b). In other words, any amount of biofuels production or distribution is sufficient to require registration.

65.     More rules apply to "Large Emission Sources." *Id.* § 253-1.2(f). Those are defined to include (1) any facility emitting 25,000 metric tons or more of carbon dioxide equivalent per emission year and (2) Suppliers of Liquid Fuels and Petroleum Products who supply "100,000 gallons or more of affected liquid fuels per emission year." *Id.* § 253-1.2(f)(1), (f)(2)(i).

66.     As a reference point, every U.S. ethanol plant, as of January 1, 2025, has a production capacity of more than 500,000 gallons of ethanol per year. U.S. Energy Information Administration ("U.S. EIA"), U.S. Fuel Ethanol Plant Production Capacity, ethanolcapacity.xlsx, (Sept. 26, 2025) https://bit.ly/4uHIfaw.

67.     As of January 1, 2025, every U.S. biodiesel plant, except for one, has a production capacity of more than 500,000 gallons per year. U.S. EIA, U.S. Biodiesel Plant    Production    Capacity,    biodeiselcapacity.xlsx,    (Sept.    26,    2025), https://bit.ly/4d38Hp4.

68.     Large emission sources must also submit "verification statements," which must be produced by "third-party verification services." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.4(c).

69.     Large emission sources are also subject to more extensive cessation requirements—including the requirement to cease emissions above the thresholds for "three consecutive years," before being allowed to institute a request for exemption from registration. *Id.* § 253-1.4(n)(1).

70.     Having defined Fuel Suppliers broadly to include any producer or distributor of any amount of Fuel, the applicability section of the GHG Rule (Section

253-1.2) then states: "Liquid and gaseous fuel suppliers listed in this subdivision, as defined pursuant to this Part, are required to report under this Part when they own and distribute for sale any affected liquid or gaseous fuel in any quantity." *Id.* § 253-1.2(i).

71.    The GHG Rule then lists eleven different categories of potential Fuel Suppliers. The first category, "position holders at terminals owning affected liquid fuels as described in section 2.16 of this part" is defined to include all Fuel producers and distributors, including those located outside of New York. N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(i).

72.    This becomes clear after stringing together three lengthy definitions. First, a "position holder" is "[a] person that holds an inventory position in . . . ethanol . . . biodiesel, or renewable diesel as reflected in the records of the terminal operator . . ." *Id.* § 253-1.3(b)(316). "Terminal includes a fuel production facility where fuels and products are produced and stored and from which fuel may be removed at a rack." *Id.* § 253-1.3(b)(411). A "rack" is a "mechanism for delivering motor vehicle fuel, diesel, or other liquid fuels or products from a refinery or terminal into a truck, trailer, railroad car, or other means of non-bulk transfer." *Id.* § 253-1.3(b)(353).

73.    Taken together, Fuel Suppliers, including ethanol and biodiesel producers, must report if they have an inventory position in a mechanism for dispensing their Liquid Fuel to trucks, barges, and railroad cars—which is how unblended ethanol and biodiesel are often transported, instead of through pipelines.

18

74. The GHG Rule does not state that the eleven listed categories are the *only* categories of Fuel Suppliers, within the universe of extremely broadly defined Fuel Suppliers, who are subject to New York's jurisdiction.

75. Moreover, the substantive section on Suppliers of Liquid Fuels and Petroleum Products (Section 253-2.16) does not limit the GHG Rule's broad extraterritorial sweep.

76. Section 253-2.16 requires all Fuel Suppliers, just discussed, to report any greenhouse gas emissions from "affected liquid fuels and petroleum products." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-2.16(a)(1)–(3).

77. But this new term initiates another concatenation of lengthy definitions that also fails to limit the GHG Rule's application to New York alone.

78. "Affected Liquid Fuels" are "Liquid fuels or petroleum products owned in New York and destined for, *or resulting in*, final sale in New York." *Id.* § 253-1.3(b)(8) (emphasis added).

79. "Final Sale" means "[t]he transfer of affected liquid fuels through a filling station to a vehicle's tank or other receptacle for temporary storage and later combustion used in the operation of an engine. *Or the transfer of liquid fuels or petroleum products to a storage vessel **for later utilization*** in facility processes, products, space heating, equipment, portable equipment, or mechanisms." *Id.* § 253-1.3(b)(155) (emphasis added).

80. "Supplier of Affected Liquid Fuels or Supplier of Liquid Fuels or Petroleum Products" means "A person that distributes, sells, transfers, delivers, or

19

supplies affected liquid fuels or blends thereof, including position holders, enterers, and below-the-rack distributors." *Id.* § 253-1.3(b)(406). And again, "Supplier" is defined to include producer. *Id.* § 253-1.3(b)(405).

81.    Combining these three definitions, the GHG Rule regulates any producer, distributor, or seller of ethanol or biodiesel that is transferred to a storage vessel for later blending into gasoline or diesel fuel that ends up being finally sold in New York.

82.    Two final aspects of the GHG Rule's geographic scope require mention. The affected liquid fuels whose GHGs need to be reported include those "diverted to non-New York locations." *Id.* § 253-2.16(a)(2). Also, Fuel that is "sold or transferred to large emission sources," must be reported, *id.* § 253-2.16(a)(3), but the definition of "Large Emission Source" is not limited to Facilities in New York, *id.* § 253-1.2(f); *id.* § 253-1.3(b)(236).

### 2. The Plain Text of the GHG Rule Applies New York's Jurisdiction Extraterritorially

83.    Taken together, the GHG Rule includes all producers and distributors of ethanol and biodiesel that ultimately results in a final sale in New York, is transferred for later utilization in New York, is diverted to a non-New York location, or is transferred to a Large Emission Source.

84.    The GHG Rule could specify, but does not, that only New York purchasers, distributors, or producers (if any) must report.

85.    Rather, textual evidence confirms the GHG Rule's broad sweep. For example, the GHG Rule specifies that one of the Reporting Categories, "Owners and

20

Operators of Facilities," includes only "[t]he owner and operator of a facility *within New York*." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(b)(1) (emphasis added). None of the other categories or subcategories in Section 253-1.2(b), including "Fuel Suppliers," are expressly limited to New York.

86.     The GHG Rule purports to define Fuel Suppliers who must report in Section 253-1.2(i). There it lists eleven different categories of Fuel Suppliers. For only three of them does the GHG Rule specify a nexus to New York—(i) "enterers," defined as a person who imports into New York affected liquid fuels outside the bulk transfer system, "that own affected liquid fuels," (ii) "Energy Service Companies who provide gaseous fuels to end users in New York," and (iii) "importers of compressed natural gas or liquefied natural gas into New York." *Id.* § 253-1.2(i)(2), (5), (7). None of the other categories are expressly limited to New York, and as discussed, the GHG Rule does not state that these eleven categories of Fuel Suppliers (broadly defined) are the exclusive list of those who must report.

87.     Section 2.16 contains more evidence that the Rule operates beyond New York's borders. That section states that Suppliers of Liquid Fuels and Petroleum Products, must report any emissions from "affected liquid fuels," which is defined to include any fuel "resulting in, final sale in New York." The definition does not limit how far up the distribution chain the GHG Rule's reporting obligations travel. Rather, the GHG Rule requires out-of-state Fuel Suppliers (which, again, includes producers and distributers) to report greenhouse gases from any fuel that "results in" a final sale in New York.

88.     Also, Section 253-2.16 expressly includes fuels "diverted to non-New York locations," indicating that the GHG Rule seeks to include emissions occurring outside of New York. The GHG Rule does not specify *from where* the fuels are diverted. The Rule thus provides that Fuel from outside of New York "diverted to non-New York locations" must be reported.

89.     And Section 253-2.16 requires reporting fuels "sold or transferred to large emission sources." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-2.16(a)(3). Neither the definition of Large Emission Sources, *id.* § 253-1.3(b)(236), nor the criteria for when a source becomes "large," *id.* § 253-1.2(f), specifies that the Large Emission Source must be in New York.

90.     There, the GHG Rule requires Plaintiffs' ethanol and biodiesel producers to report GHG emissions for any fuel delivered to an out-of-state refinery, blending facility, or rack that could result in a final sale in New York.

91.     DEC's non-binding "Fact Sheet" and "FAQ" documents, released together with the GHG Rule, also do not limit the rule's geographic reach.

92.     The Fact Sheet states that "Suppliers of liquid fuels and petroleum products" must report "if supplying any quantity of liquid fuels or petroleum products to end users in New York State." DEC, Mandatory Greenhouse Gas Reporting Program Fact Sheet, https://bit.ly/4sherkI (last visited May 12, 2026).

93.     The Fact Sheet does not state that only the person who provides the fuel to an end user in New York must report.

94.     Read in connection with the GHG Rule, this non-binding Fact Sheet provides that Fuel Suppliers must report any amount of fuel that ends up being provided to an end user in New York by a person multiple links down the distribution chain from the initial sale.

95.     DEC's Frequently Asked Questions document similarly states that "reporting entities" are "Fuel suppliers that supply a quantity of fuel to an end user in New York State that generates any amount of GHG emissions per emission year." DEC, Mandatory Greenhouse Gas Reporting Program Frequently Asked Questions, https://bit.ly/3LH8w8d (last visited May 12, 2026).

96.     Again, the non-binding commentary on the GHG Rule does not limit the reporting requirement to only the entity that provides the fuel to an end user in New York.

97.     New York's own statements provide further evidence that the GHG Rule is designed to regulate beyond New York's borders. In a document summarizing and responding to public comments on the draft GHG Rule, New York provides that "multiple commenters state that the proposed Part 253 directly violates the Dormant Commerce Clause by attempting to regulate commercial interests outside of New York State borders." DEC, Assessment of Public Comments, 6 NYCRR Part 253, Mandatory Greenhouse Gas Reporting Program, at 90, https://bit.ly/4sgVP4o (last visited May 12, 2026). The comments themselves do not appear to be available online.

98.     Rather than stating affirmatively that the GHG Rule does not apply to persons, transactions, and activity outside of New York, the document vaguely states,

"[t]he proposed regulations were developed to be in compliance with the constitutional reach of New York's sovereign authority as limited by the U.S. Constitution and federal law. The proposed reach of the regulations are [*sic*] necessary for New York State to comply with the statutory directives of the Climate Act." *Id.*

99.  Other commenters were similarly concerned. One "suggests that out-of-state emissions should be outside the scope of the mandatory reporting and cap and invest programs." *Id.* at 99. And still another commenter asked "on what basis the Department can require fuel production facilities and refiners out of state to provide additional data." *Id.* at 153.

100.  New York's response to these two comments was identical to its non-committal response described above: "The proposed regulations were developed to be in compliance with the constitutional reach of New York's sovereign authority as limited by the U.S. Constitution. The proposed reach of the regulations are [*sic*] necessary for New York State to comply with the statutory directives of the Climate Act. *Id.* at 99, 153.

101.  New York also issued a Regulatory Impact Statement with the Rule. *See* DEC, Revised Regulatory Impact Statement, 6 NYCRR Part 253, Mandatory Greenhouse Gas Reporting Program, https://bit.ly/4qiUR5G ("RIS"). The Regulatory Impact Statement asserts New York's jurisdiction over separate sovereigns: "State and local governments may be Reporting Entities under Part 253. Any State and local entity that has a reporting obligation would incur costs under the program. The costs

24

to State and local entities would be the same as all other entities subject to the program which, as described above, may include reporting or, for larger sources, verification costs." RIS at 47.

102.    Not only state entities, but the Rule also purports to require federal military installations to report. The Rule specifies that "facility" includes "any physical property, plant, building structure, source, or stationary equipment" and permits "operators of military installations to classify such installations as more than a single facility based on distinct and independent functional groupings within contiguous military properties." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.3(b)(148) ("Facility").

103.    Accordingly, the GHG Rule asserts New York's jurisdiction beyond its borders—including to regulate any Fuel Supplier, no matter where it is located—so long as "the final sale or consumption of the fuel or product to an end user occurred in New York." *Id.* § 253-1.3(b)(132) ("emission year").

### 3. The Consequences for Being a Reporting Entity Are Substantial, to Include Criminal Penalties

104.    New York presumes jurisdiction over all emission sources unless the owner of the emissions source demonstrates the GHG Rule does not apply: "The department may request a demonstration from the owners and operators of an emission source that the emission source does not meet one or more of the applicability criteria specified in this Part. Such demonstration must be provided to the department within 30 days of receipt of a written request." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(m).

25

105.   If an emission source falls below the reporting thresholds, and thus no longer needs to report, it bears the burden of demonstrating its "emissions are reduced below applicable reporting and verification thresholds . . . ." *Id.* § 253-1.2(n).

106.   "Any GHG emission source" that falls within the GHG Rule "must submit an annual emissions data report." *Id.* § 253-1.2(e).

107.   "The emissions data report must cover all source categories and GHGs for which calculation methods are provided or referenced in this Part for the reporting source." *Id.*

108.   "Each reporting entity must submit an emissions data report no later than June 1 of the calendar year immediately following each emission year." *Id.* § 253-1.4(b).

109.   If an entity fails to submit a report as required, the "department may develop and assign an emissions level . . ." by default. *Id.* § 253-1.4(d).

110.   Large emission sources, defined to include Fuel Suppliers who produce 100,000 gallons of fuel or more per year, *id.* § 253-1.2(f)(2)(ii), must submit reports verified by third-party verification services, *id.* § 253-1.4(c).

111.   For all reports, third-party or otherwise, the reporting entity must also follow complex measurement accuracy and collection methodology requirements. *See id.* § 253-1.4(g), (h), (i).

112.   New York admits that the compliance costs will be substantial. New York anticipates that regulated entities will incur "reporting costs, including both the preparation of an annual emissions report and, for some facilities, the purchase of

26

new monitoring equipment (if for example existing equipment cannot be calibrated or maintained appropriately)." RIS at 45.

113. Also, "large emitters," which is practically all biofuels plants in the United States, will incur "costs for third-party verification of submitted GHG emissions data." *Id.*

114. In real dollars, New York has applied estimates of costs prepared by the State of California and, adjusting for inflation, estimates a range from "a low of just over $17,500 and a high of just over $91,000 with a midpoint of just under $57,000 per facility per year." *Id.* at 45 & n.46.

115. Large emission sources face additional costs for the third-party verification the department requires them to submit: "the Department estimates verification services could range between $4,000 annually for the simplest facilities up to $17,000 annually for the most complex facilities and fuel suppliers." *Id.* at 46.

116. Additionally, New York asserts extraordinary power to enforce the GHG Rule. *See* N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.9.

117. DEC has both civil and criminal enforcement power concerning any violation of the proposed rules. *Id.* § 253-1.9(a); N.Y. Env't Conserv. Law § 71-1307.

118. DEC also asserts the power to enjoin any violation of the GHG Rule. N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.9(g).

119. When prosecuted criminally, the entity or appropriate representative "shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine not to exceed one thousand dollars for each day during which such violation

27

continues or by imprisonment for a term of not more than one year, or by both such fine and imprisonment." N.Y. Env't Conserv. Law § 71-1307(3).

120. When prosecuted civilly, the entity "shall be liable to the people of the state for a civil penalty not to exceed eight thousand dollars and an additional penalty of two thousand dollars for each day during which such violation continues." N.Y. Env't Conserv. Law § 71-1307(1).

121. Those "violations" are structured to mount expeditiously. For example, "[e]ach day or portion thereof that any report required by this Part remains unsubmitted, is submitted late, *or contains information that is incomplete or inaccurate* is a single, separate violation." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.9(b) (emphasis added).

122. And "[e]ach failure to measure, collect, record, or preserve information in the manner required by this Part constitutes a separate violation, except where the emission source can demonstrate that the failure results solely from maintenance or calibration required by this Part." *Id.* § 253-1.9(d).

123. Additionally, "[e]ach metric ton of $CO_2e$ emitted but not reported as required by this Part is a separate violation." *Id.* § 253-1.9(c).

124. According to the Rule, a metric ton of $CO_2e$ is approximately 4.12 standard barrels, or approximately 173 gallons, of ethanol. *See id.* § 253-2.16(b)(2) (equation for biomass derived fuels); *id.* at Table 2-5 (specifying emissions factors for ethanol).

125. For biodiesel, the Rule provides that a metric ton of $CO_2e$ is approximately 2.52 barrels or approximately 106 gallons. *Id.* at Table 2-5 (specifying emissions factors for biodiesel).

126. Ethanol and biodiesel suppliers are likely to know with reasonable precision the quantity of fuel sold to one of their customers. But they are far less likely to know how much of that fuel, after one or more downstream transactions, ultimately ends up in New York. If Plaintiffs' Fuel Suppliers must comply with the GHG Rule, their estimates for this potentially unknowable quantity of Liquid Fuel are subject to a relatively narrow margin of error, potentially making the GHG Rule extremely punitive.

127. And because the GHG Rule requires all Reporting Entities to keep records for five years—and ten years for large emission sources—late-discovered inadvertent inaccuracies could result in millions of dollars in penalties. *See id.* § 253-1.7(a).

128. The Rule also imposes extensive record keeping requirements to include records related to calculation and analysis of GHG reporting, in a readily available format to enable inspection upon New York's request. *Id.* § 253-1.7(d).

129. New York also insists that "[e]missions data submitted to the department under this Part is public information and shall not be designated as confidential." *Id.* § 253-1.8(a). As a result, information that may be commercially sensitive—or, at least, information from which commercially sensitive information

can be readily determined—will be available to competitors through public records requests.

130.    Finally, as of January 1, 2026, the GHG Rule's effective date, New York asserts the right to conduct physical inspections of Reporting Entities. *Id.* § 253-1.9.

131.    Any Reporting Entity under the GHG Rule presumptively waives their privacy interests in their property:

> The department is *authorized to access any real property* at which an emission source exists during normal business hours. Department representatives may traverse the property, inspect facilities, take measurements, analyze physical site characteristics, take environmental samples, sketch and photograph the property, and conduct other activities necessary to evaluate emissions and compliance with applicable statutory or regulatory requirements. The department may make reasonable efforts to share with the property owner or operator data collected during any access of real property. *Establishment of a reporting account* pursuant to section 1.6 of this Part *may be considered written permission* from the owner(s) of the real property on which an emission source is located for the department to access such property.

*Id.* § 253-1.2(e)(3) (emphasis added).

132.    Each reporting entity must designate a personal representative in its yearly report who is responsible for certifying that New York shall be permitted such access. *Id.* § 253-1.5(b).

133.    New York asserts in two different identical sections that, for each reporting entity, "[t]he department or an authorized representative shall be allowed upon presentation of credentials and other documents as may be required by law to:

> (1) enter upon a reporting entity's premises where a facility subject to the reporting requirements of this Part, is located or

emissions-related activity is conducted, or where records subject to the reporting requirements of this Part are kept;

(2) have access to and copy, at reasonable times, any records subject to the reporting requirements of this Part;

(3) inspect at reasonable times any emission sources, equipment (including monitoring and emission control equipment), practices, and operations regulated or required pursuant to this Part; and

(4) sample or monitor at reasonable times substances or parameters for the purpose of assuring compliance with the requirements of this Part."

*Id.* § 253-1.5(b); *id.* § 253-1.9(h).

### D.   State Plaintiffs Have Different Greenhouse Gas Policies

134.   State Plaintiffs, through their elected representatives, have their own policies for regulating and quantifying emitted GHGs. Those policies materially differ from New York's.

135.   Iowa, by law, must maintain "a voluntary greenhouse gas registry for purposes of cooperating with other states in tracking, managing, and crediting entities in the state that reduce their generation of greenhouse gases or that provide increased energy efficiency." Iowa Code. § 455B.152(3)(a).

136.   Also, by December 31 of each year, Iowa's Department of Natural Resources submits a report detailing Iowa's prior-year GHG emissions and forecasting trends. Iowa Code § 455B.104(3). The report is generated in a "top down" manner by using measures of certain economic activity to estimate greenhouse gas emissions from certain economic sectors, for example, agriculture. *See, e.g.*, 2024 Iowa Statement Greenhouse Gas Emissions Inventory Report, Technical Support Document, (Dec. 23, 2025) https://bit.ly/49Qxf37.

31

137. But Iowa does not require any reporting from greenhouse gas sources that are not otherwise required to report under federal law.

138. Moreover, Iowa has recently enacted the Greenhouse Gas Liability Limitation Act, H.F. 2527, effective July 1, 2026, that significantly restricts the ability for plaintiffs to recover damages in any lawsuit alleging harm from greenhouse gas emissions.

139. Missouri does not have *any* reporting requirements or limits for GHG emissions.

140. Under federal law, certain Iowa and Missouri firms are required to supply GHG emissions data. *See* 40 C.F.R. Part 98.

141. The New York GHG Rule, despite referencing these federal laws, often differs significantly from those national requirements.

142. For example, federal law does not require ethanol producers to report any GHG emissions, unless their production facilities generate a threshold of 25,000 metric tons of carbon dioxide equivalent per year. 40 C.F.R. § 98.2; *see also* EPA, Greenhouse Gas Reporting Program, Subpart J – Ethanol Production (Mar. 30, 2026), https://bit.ly/3Z6Zqog.

143. New York's GHG Rule, by contrast, requires ethanol suppliers to calculate GHG emissions based on the amount of product that is distributed in New York—assuming that amount can be reasonably known. That is a different calculation, requiring additional, different compliance methods with different costs.

144. The GHG Rule thus imposes an additional compliance burden on entities that must comply with differing federal law requirements and a wholly new area of environmental compliance on entities untouched by federal GHG reporting requirements.

### E.   The GHG Rule Harms Plaintiffs

#### 1.   State Plaintiffs' Harm

145. State Plaintiffs have standing to sue in their sovereign and quasi-sovereign capacity.

146. State Plaintiffs' sovereign interests are injured through Defendants' attempt to use the GHG Rule to impose costs and fines on citizens and firms located in Iowa and Missouri for conduct that occurs within their exclusive jurisdiction. In so doing, Defendants are displacing Plaintiffs' public policies regarding greenhouse gas reporting, in favor of New York's policy, within State Plaintiffs' own sovereign spheres. That harms State Plaintiffs' ability to exercise their sovereignty because New York is interfering "with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335–36 (1989).

147. Moreover, State Plaintiffs are equal sovereigns under the Constitution, as are all other States. *See Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). They therefore have "an interest in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). Defendants' effort to project New York's policies into Iowa and Missouri denigrates Plaintiffs' sovereignty, while

elevating New York's, which denies State Plaintiffs the equal sovereignty of all States.

148. State Plaintiffs also have *parens patriae* authority to act as the "representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981). Harm to State Plaintiffs' economies falls within well-established bases for a State to assert its *parens patriae* authority. *See Georgia v. Pa. R. Co.*, 324 U.S. 439, 447 (1945) ("The Rights which Georgia asserts, are those arising from a[] . . . scheme, it is said, has injured the economy of Georgia."). And the GHG Rule harms State Plaintiffs' economies.

149. As New York admits, the GHG Rule imposes reporting and compliance costs—in addition to potentially substantial fines and criminal penalties—on State Plaintiffs' economies, employees, and consumers.

150. Those costs will also be borne by State Plaintiffs, in the form of increased prices, decreased economic production, and decreased employment.

151. Increased costs will lead to reduced profits, and those reduced profits will lead to lower corporate and income tax receipts for State Plaintiffs.

152. Also, any decrease in employment resulting from these increased costs will in turn impose direct monetary costs on State Plaintiffs—in the form of unemployment and other benefits.

153. Those concrete harms to State Plaintiffs and their economies are directly traceable to Defendants' unlawful exercise of authority over State Plaintiffs'

34

citizens and can be redressed by holding the GHG Rule unlawful or, at a minimum, limiting its application solely to activity that occurs within New York.

154. Specifically, State Plaintiffs' substantial ethanol and biodiesel production industry qualifies as a "Supplier of Liquid Fuel or Petroleum Product." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(b)(2)(ii).

155. The GHG Rule defines a "supplier" as *inter alia* a "producer" or "importer." *Id.* § 253-1.3(b)(405). And "Liquid Fuel or Petroleum Product" is defined to include "Renewable Diesel" and "Biomass-derived fuels," *id.* § 253-1.3(b)(248)— which, in turn, is defined specifically to include ethanol and biodiesel, *id.* § 253-1.3(b)(37).

156. Iowa produces the most ethanol of any state in the nation. U.S. EIA, Iowa, Analysis (Oct. 16, 2025), https://bit.ly/4qgYlFU.

157. Iowa has 42 ethanol refineries and, in 2025, produced approximately 4.6 billion gallons of ethanol. Iowa Renewable Fuels Association ("IowaRFA"), Biofuels Industry at a Glance, https://iowarfa.org/resource-center/statistics/ (last visited May 12, 2026).

158. In 2025, Iowa produced approximately 28% of the total ethanol produced in the United States. *See id.*

159. Iowa's ethanol production capacity is approximately 28 times greater than the ethanol used in Iowa, which means most of the ethanol produced in Iowa is exported for use in other States. *See* U.S. EIA, https://bit.ly/4qgYlFU.

35

160.   In 2025, ethanol production contributed approximately $5.3 billion to Iowa's Gross Domestic Product, generated approximately $2.3 billion of income for Iowa households, and accounted for approximately 30,000 jobs. IowaRFA, Renewable Fuels Impact on the Iowa Economy, https://iowarfa.org/economiccontribution/ (last visited May 10, 2026).

161.   Missouri is the thirteenth largest ethanol producing state in the nation. U.S. EIA, Missouri, Analysis (Oct. 16, 2025), https://bit.ly/4rBdpi0.

162.   Missouri has six ethanol manufacturing plants that produced 338 million gallons of ethanol in 2023. *Id.*

163.   And notably, corn-based ethanol, like the kind produced in Iowa and Missouri, has life cycle greenhouse gas emissions that are 43 percent less than gasoline. U.S. Dep't of Agriculture Factsheet: Lifecycle Greenhouse Gas Emissions of Corn-Based Ethanol, *available at* https://bit.ly/3LSYOQ7 (last visited May 10, 2026).

164.   Iowa also produces the most biodiesel of any state in the nation. U.S. EIA, https://bit.ly/4qgYlFU.

165.   Iowa currently has eight plants and, in 2024, produced approximately 353 million gallons of biodiesel, which was approximately 17% of the nation's total production. IowaRFA, Biofuels Industry at a Glance, https://iowarfa.org/resource-center/statistics/ (last visited May 12, 2026).

166.   As with ethanol, most of Iowa's biodiesel is supplied for use out of state, as Iowa's production capacity is approximately six times larger than its consumption. EIA, https://bit.ly/4qgYlFU.

167.   In 2025, biodiesel production contributed approximately $520 million to Iowa's Gross Domestic Product, generated approximately $92 million of income for Iowa households, and accounted for approximately 1,200 jobs. IowaRFA, Renewable Fuels Impact on the Iowa Economy, https://iowarfa.org/economiccontribution/ (last visited May 10, 2026).

168.   Missouri produces the second most biodiesel of any state in the nation. U.S. EIA, https://bit.ly/4rBdpi0.

169.   Missouri has five biodiesel plants that produced approximately 257 million gallons in 2023. *Id.*

170.   The lifecycle emissions from biodiesel are 74% lower than those from petroleum diesel. U.S. Dep't of Energy, Alternative Fuels Data Center, Biodiesel Vehicle Emissions, https://bit.ly/49zjhBR (last visited May 12, 2026).

171.   The NY GHG Rule imposes compliance costs and carries the potential for ruinous fines, criminal penalties, and even inspections and injunctions of biofuels production and distribution in Iowa and Missouri.

172.   New York's assertion of jurisdiction will therefore harm State Plaintiffs' industry and, in turn, their economies and their citizens.

### 2.  AmFree's Harm

173.   The GHG Rule harms AmFree's members both directly and indirectly— by directly regulating biofuels producers outside of New York who are members of AmFree and by increasing costs on members of AmFree who purchase biofuels.

174.   AmFree has at least one member who produces and distributes ethanol outside of New York.

175. Under the Rule, the AmFree member qualifies as a "Supplier of Liquid Fuel or Petroleum Product." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(b)(2)(ii).

176. As New York admits, the GHG Rule will impose reporting and compliance costs on regulated parties, together with potential civil and criminal penalties.

177. New York's assertion of jurisdiction over this AmFree member will therefore cause harm in the form of increased compliance costs and potential civil and criminal penalties.

178. Similarly, AmFree has at least one member who purchases biofuels, either in unblended form or blended in other fuel, such as gasoline.

179. Although the GHG Rule does not directly regulate that member, and other similarly situated companies, the compliance and other costs to producers and distributors, will be passed along to those purchasers.

180. Those increased costs are the direct result of New York's assertion of jurisdiction over biofuels producers outside of New York.

### COUNT I
### Violation of the Constitution's Prohibition on Extraterritorial Regulation

181. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully set forth herein.

182. The Supreme Court has described the "territorial limits of state authority under the Constitution's horizontal separation of powers." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). And the Court has invalidated state actions that exceeded "the usual 'legislative power of a State to act

38

upon persons and property within the limits of its own territory,'" *see id.* at 375 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).

183.   This extraterritoriality principle has been applied in the context of the Dormant Commerce Clause—for example, to bar a state law that regulated commerce outside the state, *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality op.), and state laws effectively dictating the prices firms can charge for their products in other states, *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986); *Healy v. Beer Institute*, 491 U.S. 324 (1989).

184.   Following the Supreme Court's lead, the Eighth Circuit has held that the Dormant Commerce Clause prohibits states from exercising their power extraterritorially—either by applying its own law to out-of-state commerce, *Styczinski v. Arnold*, 46 F.4th 907, 913 (8th Cir. 2022), or by, in effect, setting prices on out-of-state transactions, *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025).

185.   But the Supreme Court has since clarified that the Dormant Commerce Clause is not the *only* Constitutional provision or principle that "mediate[s] competing claims of sovereign authority under our horizontal separation of powers." *Pork Producers*, 598 U.S. at 376. Other provisions, including the Due Process Clause and the Full Faith and Credit Clause, together with "principles of sovereignty and comity," also embody the Constitution's extraterritoriality principle. *See id.*

186.   Indeed, the bar on a State's exercise of extraterritorial power is best understood as inherent in the Constitution's structure. *See Pork Producers*, 598 U.S.

39

at 376 n.1 (citing Donald H. Regan, *Siamese Essays: (i) Cts Corp. v. Dynamics Corp. of Am. and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865, 1885 (1987) ("[T]he extraterritoriality principle is not to be located in any particular clause. It is one of those foundational principles of our federalism which we infer from the structure of the Constitution as a whole.")).

187.   Importantly, "the extraterritoriality principle does not flow from the dormant commerce clause." *See* Regan, *supra*, at 1888.

188.   The extraterritoriality principle is one of "many other constitutional doctrines that are not spelled out in the Constitution but are nevertheless implicit in its structure and supported by historical practice." *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230, 247 (2019) (regarding State sovereign immunity). For example, the President's removal power, executive privilege, and executive immunity are all "historically rooted principle[s] embedded in the text and structure of the Constitution." *Id.* at 248 (citing cases).

189.   That reasoning about the Constitution's structure is an essential mode of constitutional interpretation. "When the Constitution is ambiguous or silent on a particular issue, this Court has often relied on notions of a constitutional plan—the implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers." *Nevada v. Hall*, 440 U.S. 410, 433 (1979) (Rehnquist, J., dissenting), *overruled by Hyatt*, 587 U.S. at 236.

190. Here, the extraterritoriality principle is the "obviously . . . necessary result," *New York Life Ins.*, 234 U.S. at 161, of the "constitutional plan," *Hall*, 440 U.S. at 433 (Rehnquist, J., dissenting), evident from "the text and structure of the Constitution," *Hyatt*, 587 U.S. at 248.

191. The Constitution's structure provides each State with sovereignty equal to every other state. This "'fundamental principle of equal sovereignty among the states,'" *Hyatt*, 587 U.S. at 246 (quoting *Shelby County v. Holder*, 570 U.S. 529, 544 (2013)), is at the core of our constitutional design. *See also Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) (describing "our historic tradition that all the States enjoy equal sovereignty") (cleaned up).

192. Our Union "was and is a union of states, equal in power, dignity, and authority." *Coyle v. Smith*, 221 U.S. 559, 567 (1911). And "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* at 580.

193. Indeed, the Supreme Court has cited the equal sovereignty principle as a basis for the extraterritoriality principle. *Pork Producers*, 598 U.S. at 376 n.1 (citing and quoting *Shelby County v. Holder*, 570 U.S. 529, 535 (2013) ("[A]ll States enjoy equal sovereignty.")). And the Eighth Circuit has noted, without deciding, that the equal sovereignty principle may supply grounds, beyond the Dormant Commerce Clause, for analyzing whether a State's law is extraterritorial. *Styczinski*, 46 F.4th at 912 n.3 (citing *Hyatt*, 587 U.S. at 244–46, and *Northwest Austin*, 557 U.S. at 203).

194. Accordingly, a State's equal sovereignty under the Constitution "implie[s] a limitation on the sovereignty of all of its sister States." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

195. The Due Process Clause also supports the extraterritoriality principle. By requiring "minimum contacts" before a State may lawfully exercise jurisdiction, the Due Process Clause provides important limitations that are "express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment" and "faithful to the principles of interstate federalism embodied in the constitution." *World-Wide Volkswagen*, 444 U.S. at 292. "Restrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.'" *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)). The Due Process Clause thus "ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen*, 444 U.S. at 292.

196. Still further constitutional provisions reinforce the Constitution's horizontal federalism and reflect the inherent territorial limitations on state authority.

197. The Full Faith and Credit Clause, for example, imposes a "constitutional obligation to enforce the rights and duties validly created under the laws of other states." *Hughes v. Fetter*, 341 U.S. 609, 611 (1951); U.S. Const. art. IV, § 1 ("Full Faith

42

and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.").

198. The Privileges and Immunities Clause similarly bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States," *Toomer v. Witsell*, 334 U.S. 385, 396 (1948), thereby "plac[ing] the citizens of each State upon the same footing with citizens of other States," *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868); U.S. Const. art. IV, § 2, cl. 1.

199. The Extradition Clause implies territorial limits to state power by invoking the concept of a "State having Jurisdiction of the Crime," U.S. Const., art. IV § 2, cl. 2.

200. The Sixth Amendment requires that defendants receive a trial "by an impartial jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI, which limits state territorial jurisdiction.

201. And the Dormant Commerce Clause also polices the proper limits of the Constitution's horizontal federalism by prohibiting State laws that (i) discriminate against out-of-state economic interests, in purpose or effect, by benefitting in-state economic interests while burdening out-of-state economic interests, *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994)), (ii) impose burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), or (iii) have the effect of regulating commerce in other States, *Healy*, 491 U.S. at 336.

202.   The extraterritoriality principle is so fundamental and firmly rooted in our constitutional design that it is also found in the jurisprudence of state supreme courts, including courts within the Eighth Circuit. *Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 131 (Iowa 1983) ("It is a generally recognized principle that a statute of one state has no extraterritorial effect beyond its borders."); *Rositzky v. Rositzky*, 46 S.W.2d 591, 594 (Mo. 1931) ("[I]t is well to remember that it is the settled law and almost axiomatic that the statutes of a state or country prescribe the law within its boundaries only, and have no extraterritorial force or effect.").

203.   The GHG Rule violates the Constitution's prohibition on extraterritorial state regulation.

204.   The GHG Rule is a broad assertion of prescriptive regulation by a single State (New York) that invades the regulatory prerogatives of other States (including State Plaintiffs).

205.   Although a State can regulate in-state aspects of interstate transactions, it can do so only when there is a sufficient connection between the State's regulatory interest and the transaction's effects within the State.

206.   The GHG Rule purports to govern people and transactions with no connection to the State of New York, let alone with "minimum contacts" to the State. *See Edgar*, 457 U.S. at 643 (1982) (plurality, op.) ("The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts.").

207. For example, Plaintiffs' ethanol and biodiesel producers do not, by mere operation, fall within New York's jurisdiction. The GHG Rule nonetheless purports to regulate them.

208. But State Plaintiffs' citizens and lawmakers do not share New York's policy preferences regarding greenhouse gas reporting. State Plaintiffs have chosen to regulate only so far and in a particular way—adopting the conscious policy choice that, within its jurisdiction, no additional reporting requirements should be imposed beyond federal law.

209. Those rules reflect State Plaintiffs' policy choices regarding the persons and firms contained within Plaintiffs' jurisdiction.

210. State Plaintiffs cannot, nor do they seek to, impose their regulatory reporting regime on other States.

211. So too is New York prohibited from imposing its requirements on persons and firms in other States, including those within State Plaintiffs' jurisdiction.

212. The GHG Rule therefore violates State Plaintiffs' sovereignty by impermissibly imposing New York's policy preferences on their citizens and firms and thereby displacing State Plaintiffs' policy preferences.

213. The GHG Rule also harms State Plaintiffs' economies by imposing burdensome compliance costs and potentially significant financial penalties on the biofuels industry operating within their borders.

214. New York's extraterritorial exercise of jurisdiction, together with compliance costs and potential financial penalties, also harms AmFree members by

45

directly imposing costs on biofuels manufacturers and also imposing costs on biofuels purchasers.

215.   The projection of New York's power into other States violates the horizontal federalism structure inherent in our Constitution, including the prohibition on extraterritorial regulation.

216.   Plaintiffs are therefore entitled to a declaratory judgment and permanent injunction ordering vacatur of the GHG Rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT II
### Federal Preemption
### (U.S. Const. art. VI, cl. 2)

217.   Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully set forth herein.

218.   The Supremacy Clause preempts State law that is expressly preempted by or conflicts with a federal statute. U.S. Const. art. VI, cl. 2.

219.   "The basic scheme of the Constitution" requires that federal law alone must govern issues concerning "air and water in their ambient or interstate aspects" because they are not "matters of substantive law appropriately cognizable by the states." *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421 (2011) ("AEP").

220.   Through the Clean Air Act, Congress chose to empower EPA, a federal agency, to regulate interstate greenhouse-gas emissions from certain sources. *See Massachusetts v. EPA*, 549 U.S. 497, 528-32 (2007); *AEP*, 564 U.S. at 424.

221.   Congress chose EPA to engage in the "complex balancing" that considers "the appropriate amount of regulation in any particular greenhouse gas-producing

sector," together with "our Nation's energy needs and the possibility of economic disruption." *AEP*, 564 U.S. at 427.

222. And the Supreme Court held in *International Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987), that the federal Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source" because doing so would "upset[ ] the balance of public and private interests so carefully addressed by the Act." *Id.* at 494.

223. Courts have discussed *Ouellette* in the context of the Clean Air Act, holding that preemption of state law under that Act operates similarly to preemption under the Clean Water Act. *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 194-97 & n.6 (3d Cir. 2013); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301-09 (4th Cir. 2010).

224. Accordingly, even if New York can lawfully regulate GHG emissions occurring within New York, it cannot apply New York law—including the GHG Rule—to greenhouse gas emissions, or other conduct, occurring outside of New York.

225. Plaintiffs are therefore entitled to a declaratory judgment and permanent injunction ordering vacatur of the GHG Rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT III
### Violation of the Constitution's Due Process Clause
### (U.S. Const. amend. XIV)

226. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully set forth herein.

47

227.  A State may lawfully exercise jurisdiction only where the target of the dispute—usually a defendant in a lawsuit, but here, the regulated entities—has "minimum contacts" with the State. *Walden v. Fiore*, 571 U.S. 277, 283–86 (2014). The regulated entities must be the ones creating the contacts, and those contacts must be with the forum State itself, not with persons who reside there. *Id.* at 284–85. Also, the contacts at issue are those sufficiently related to the underlying controversy or dispute; contacts unrelated to the dispute are not relevant. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 264 (2017).

228.  Through the GHG Rule, New York asserts regulatory jurisdiction over persons and firms—to include AmFree's members and those located or organized in Iowa or Missouri—that lack any "minimum contacts" with New York related to the conduct subject to the GHG Rule. The GHG Rule therefore violates their Due Process rights under the Fourteenth Amendment.

229.  Plaintiffs are therefore entitled to a declaratory judgment and permanent injunction ordering vacatur of the GHG Rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

**COUNT IV**
**Violation of the Constitution's Prohibition on Unreasonable Searches**
**(U.S. Const. amend. IV)**

230.  Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully set forth herein.

231.  The GHG Rule provides that New York's Department of Environmental Conservation "is authorized to access any real property at which an emission source exists." N.Y. Comp. Codes R. & Regs. tit. 6, § 253-1.2(e)(3).

232. New York asserts a right of warrantless inspection of property where "[DEC] representatives may traverse the property, inspect facilities, take measurements, analyze physical site characteristics, take environmental samples, sketch and photograph the property, and conduct other activities necessary to evaluate emissions and compliance with applicable statutory or regulatory requirements." *Id.*

233. The Fourth Amendment, as incorporated against the States by the Fourteenth Amendment, forbids New York from conducting unreasonable searches.

234. Typically, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *City of L.A. v. Patel*, 576 U.S. 409, 419 (2015) (cleaned up). "This rule applies to commercial premises as well as to homes." *Id.* at 419-20 (citation omitted).

235. A physical inspection of a property is a quintessential example of a "search." *Id.*

236. The Supreme Court has held that an exception to the warrant requirement exists for "administrative searches," *Camara v. Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534 (1967), "where the 'primary purpose' of the searches is 'distinguishable from the general interest in crime control.'" *Patel*, 576 U.S. at 420 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)).

237.   But, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.*

238.   The GHG Rule does not provide any such opportunity for precompliance review before a search is conducted and therefore violates the Fourth and Fourteenth Amendment rights of the regulated parties.

239.   Nor do the Reporting Entities "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Patel*, 576 U.S. at 424 (quotation marks omitted).

240.   The Supreme Court has recognized only four industries that are so regulated as to have no Fourth Amendment expectation of privacy: liquor sales, firearms dealing, mining, and running an automobile junkyard. *Id.*

241.   The Eighth Circuit has recognized one more: commercial trucking. *Calzone v. Olson,* 931 F.3d 722, 724 (8th Cir. 2019).

242.   "Unlike liquor sales, firearms dealing, mining, [commercial trucking], or running an automobile junkyard, nothing inherent in the operation of [any 'Reporting Entity' under the GHG Rule] poses a clear and significant risk to the public welfare." *See Patel*, 576 U.S. at 424 (citations omitted).

243.   For that reason, the GHG Rule's warrantless searches violate the Fourth and Fourteenth Amendments.

50

244. Plaintiffs are therefore entitled to a declaratory judgment and permanent injunction ordering vacatur of the GHG Rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that the Court:

A. Declare pursuant to 28 U.S.C. §§ 2201–02, that the *Mandatory Greenhouse Gas (GHG) Reporting Program*, N.Y. Comp. Codes R. & Regs. tit. 6, part 253, violates the Constitution's prohibition on extraterritorial state regulation, is preempted by the Clean Air Act, and violates amendments XIV and IV to the Constitution;

B. Permanently enjoin Defendants from enforcing the GHG Rule;

C. In the alternative, permanently enjoin Defendants from enforcing the GHG Rule (i) against AmFree's members, (ii) in the State of Iowa or the State of Missouri, and (iii) against entities incorporated in Iowa or Missouri in connection with activity occurring outside of New York;

D. Award Plaintiffs their reasonable costs, including attorneys' fees, for bringing the action, per 42 U.S.C. § 1988; and

E. Grant other legal and equitable relief as the Court deems just and proper.

DATED: May 14, 2026

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*


CATHERINE L. HANAWAY
Attorney General of Missouri

Louis J. Capozzi III, #77756(MO)
  *Solicitor General*

*/s/ William James Seidleck*
William James Seidleck, #77794(MO)
  *Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
  *Deputy Solicitor General*
Office of the Attorney General
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for State of Missouri*

/s/ Michael A. Petrino
Michael A. Petrino*
Caleb Kruckenberg**
CENTER FOR INDIVIDUAL RIGHTS

52

1100 Connecticut Ave, NW
Suite 625
Washington, DC 20036
(202) 833-8400
petrino@cir-usa.org
kruckenberg@cir-usa.org

*Counsel for Plaintiffs*

\*Motion for admission *pro hac vice*
forthcoming

53